## CAMPBELL v. ROSENOW.
### No. 8432.

Court of Civil Appeals of Texas. San Antonio.
June 25, 1930.

G. B. Fenley, of Uvalde, and Phil Foster, of Del Rio, for appellant.

Jones & Lyles, of Del Rio, for appellee.

COBBS, J.

Appellee sued appellant to cancel two certain notes for the sum of $4,525 each, executed by appellee, John Rosenow, and to prevent the appellant, J. A. Campbell, from transferring or disposing of same; appellee claiming that said notes had originally been procured by the person transferring same to appellant, through fraud and/or. failure of consideration. Appellant filed countersuit in the same action, seeking a recovery on one of the notes, the other not being due.

The case was tried to the court without a jury, and judgment rendered in favor of appellee canceling said notes; and denying a recovery to appellant on the note sued on by way of cross-action. From this judgment, appellant has appealed.

The only question necessary for discussion or decision is whether or not appellant is a good-faith purchaser for value without the knowledge of any vice in the consideration paid for the notes or whether obtained through fraud.

For a clear understanding of the issues in the case we set out the notes, as follows:

"$4,525.00                     Feby. 13, 1929.
"On or before six months after date I promise to pay to the Order of Myself, or Bearer Four Thousand, Five Hundred Twenty-five & no/100 Dollars, for value received, with interest at the rate of 6 per cent. per annum from date until paid, with reasonable attorney's fees for collection if not paid when due. The drawers and endorsers severally waive presentment for payment, protest and notice for protest, and nonpayment of this note.
"Negotiable and payable at Del Rio Tex.
                              "John Rosenow.
"Due Aug 13, 1929."
Indorsed thus: "John Rosenow."

"$4,525.00                     Feby 13th, 1929
"On or before twelve Months after date I promise to pay to the order of Myself, or Bearer Four Thousand, Five Hundred Twenty-five & No/100 dollars, for value received, with interest at the rate of 6 per cent per annum from date until paid, with reasonable attorney's fee for collection if not paid when due. The drawers and endorsers severally waive presentment for payment, protest and notice for protest, and nonpayment of this note.
"Negotiable and payable at Del Rio Tex.
                              "John Rosenow.
"Due Feby 13th, 1930."
Indorsed thus: "John Rosenow."

It will be observed that neither the indorsement of Ben E. New, nor of any other person, appears thereon, except that of the

maker of the notes to whom same were made payable. The effect of that kind of indorsement was simply to show the owner in using same and for transferring same, and its legal effect amounted to no more than if the name had never been written in the body of the note, and is not an indorsement having the legal effect, as provided by our Negotiable Instruments Law (Rev. St. 1925, art. 5932 et seq.)."

The evidence shows that the notes were given for worthless and fraudulent German bonds.

For the purpose of illustrating this case and giving a better conception thereof, we copy appellant's testimony as set out in appellee's brief:

"I purchased the two notes signed by John Rosenow and referred to in Plaintiff's original petition; I purchased these notes from Mr. Ben E. New. I was approached by a virtual stranger who offered to sell me the two notes of John Rosenow in the sum of $4,525.00, each bearing interest from date * * * It is a fact that I did not ascertain from these men or otherwise that these notes were given for a number of worthless bonds or what consideration these notes were given for. I did not institute and pursue inquiry with respect to said notes because I knew of Mr. Rosenow's reputation locally for moral and financial integrity * * * It is a fact that I did make inquiry as to the solvency of John Rosenow and learned that he was absolutely solvent and worth a great deal more than the amount of the notes and that the amount of said notes could be made off of him with an execution. I learned that Mr. Rosenow was solvent. It is a fact that I purchased from a man who was virtually a stranger to me without recourse on the seller of these notes * * * I had only met the person from whom I made the purchase; the person from whom I bought the notes advised me that he was vice-president of an investment bank in Dallas when he introduced himself to me. I gave $7,500.00 for the two notes in question. The person from whom I purchased these notes introduced himself to me as vice-president of an investment bank in Dallas, Texas, and I made no further inquiry. I made no inquiry of the person from whom I purchased these notes as to what the notes were given for and what consideration John Rosenow received for such notes; I made no such inquiry; I had only met him a few minutes before purchasing the notes.

"Before I completed the purchase of these notes I consulted three bankers * * * I approached them and showed them the notes. When the notes were handed to me by Mr. New for examination I had never seen a note drawn like it before, payable to myself and I went to Mr. Pierce and asked him if the note was legal and he said that it was and then I went to Mr. Stafford and asked him if the note was legal and he said that it was. I then went to Mr. Walker and asked him if it was a legal note and he said that it was. I bought the notes on the 15th day of February, 1929, and the interest had only run two days on them when I bought them. I bought them from Mr. Ben E. New and Mr. New was a total stranger to me. I had known him but a few minutes when I bought the notes but I did know that Mr. Rosenow was a solvent man when I bought the notes. I knew that he was worth many times the amount of the notes. I was informed that he was. I knew that I could make the amount of the notes with an execution many times at the time I bought them. I was advised of it. This man came to me a total stranger with notes of a man that was that solvent and that good and which would have been due in a short time and discounted them to me $1,550.00. I didn't need to ask any questions of him as to what Mr. Rosenow had gotten for these notes. I accepted them from this man who offered to sell them to me and represented himself to be the Vice-President of an investment bank in Dallas without attaching any responsibility to him; I accepted the notes without recourse on him and didn't even require any act to attach any responsibility whatever to the man that was selling the notes but took them as they were without making any inquiry as to what Mr. Rosenow got for them. * * * My business is that of minister of the gospel and handling some securities * * * I have been all of the time purchasing notes and securities. I have purchased a large number of them and yet I accepted these notes from a stranger who represented himself to be vice-president of an investment bank of Dallas and accepted them without requiring him to attach any responsibility by indorsement thereto. I knew Mr. Rosenow was solvent and I knew these notes evidenced his obligation for $9,050.00 and that he was absolutely solvent and I bought them for $7,500.00.

"I did make inquiry from the men working in the bank as to the form of the notes I was buying and whether or not they were in proper form to evidence an obligation. I concerned myself about that but made no inquiry as to whether John Rosenow had received anything for these notes or not.

"I had known of Ben E. New for 17½ hours before I made this purchase * * * 15½ hours before I purchased them I knew that Mr. Rosenow's notes were offered for sale. If I bought them I expected to buy at a discount and I made no inquiry during that time from anybody as to what business Mr. New, the man I was going to deal with, was in. I didn't feel any concern in what John Rosenow got for these notes."

Appellee testified: "If Mr. Campbell had telephoned me about buying the notes I would have advised him not to buy them, because Mr. New promised to hold them. That would have aroused my suspicion."

The form of the notes showed such unusual circumstances in connection therewith as to arouse his suspicion, and it did to such an extent that he called on bankers to ascertain if the notes were valid, but not if they were properly indorsed to pass title. While the title thereto passed by delivery and not by any indorsement such as the law requires with certain legal effect. Undoubtedly the title passed by delivery of the notes and by such indorsement, and that is all it did do, but that carried with it the notice of the vice in the note. In other words, this note and the other circumstances put appellee upon notice to inquire as to the bona fides of the transaction. Appellant was not shown to be a holder in good faith and a purchaser in due course, and therefore subject to all the defenses which it would have been subject to in the hands of New or to make it nonnegotiable. Now, as to whether it was taken in good faith was a jury question. Whether he had knowledge of such facts in taking the instrument amounted to bad faith, was a question of fact, and the burden was upon him to show the same. No evidence was introduced by appellant to show that the notes were not procured by fraud. Pope v. Beauchamp, 110 Tex. 271, 219 S. W. 447. It is the province of the jury to say whether such a transaction is bona fide. Houston E. & W. T. Ry. Co. v. Runnels, 92 Tex. 307, 47 S. W. 971; Forster v. Enid (Tex. Civ. App.) 176 S. W. 788; Douglass v. Lockhart (Tex. Civ. App.) 168 S. W. 382; Smith v. Word (Tex. Civ. App.) 248 S. W. 734; Thos. Goggan v. Synnott (Tex. Civ. App.) 134 S. W. 1184; Poulter v. Miller (Tex. Com. App.) 221 S. W. 965; Goolsby v. Manning (Tex. Civ. App.) 270 S. W. 936; Downs v. Stevenson, 56 Tex. Civ. App. 211, 119 S. W. 315; Mee v. Carlson, 22 S. D. 365, 117 N. W. 1033, 29 L. R. A. (N. S.) 359.

"Failure to make inquiry may be considered under many circumstances as evidence of bad faith on the part of the purchaser of the note." 8 C. J. p. 499, § 709.

"If the note was offered for sale under circumstances that ought to have excited the suspicions of a prudent man even though he gave full value for it, this may be considered by the jury as evidence of bad faith." 8 C. J. p. 500, § 710.

"The circumstances may be so cogent and obvious that to remain passive and make no inquiry would amount to bad faith and are sufficient evidence to take the question to the jury." 8 C. J. p. 501.

"Gross negligence on the part of purchaser does not amount to bad faith as a matter of law, although it is evidence from which bad faith may be inferred by a jury." 8 C. J. p. 503.

"Purchaser must not wilfully shut his eyes to means of knowledge which he knows are at hand for the reason that such conduct whether equivalent to plenary knowledge would be evidence of bad faith." 8 C. J. p. 505.

"Inadequacy of purchase price is always a fact to be considered by the jury as evidence of bad faith." 8 C. J. p. 508, § 717.

"Indorsement 'without recourse' may with other circumstances be evidence of bad faith." 8 C. J. p. 517.

"Purchase from a stranger for an inadequate consideration may be considered by the jury as evidence of bad faith." 8 C. J. p. 517, § 725.

Negligence itself does not show bad faith, but that is a fact that the jury may find from all the facts and circumstances of the particular case.

It will be observed that when the owner sold the notes to appellant they were not indorsed by him at all, and that was significant also. The notes were purchased from a stranger a short time after their execution and delivery, whom appellant had never seen, without requiring an indorsement to be made or any recourse upon the stranger selling same, which was an unusual act. The notes were made payable to appellee, and the name of the purchaser did not appear on them. There was nothing to identify the seller with the transaction, and this was a suspicious circumstance. The burden was on the holder to show the good faith of the transaction. Article 5935, R. S.

Most of the cases cited by appellant were written before the Negotiable Instrument Law took effect, which law covers the rule in this case and provides that, where it is shown that the title is defective, the burden shifts to the holder. Those cases cited by appellant can have no application to a case, as this, tried under the Negotiable Instrument Act.

Appellant testified: "I accepted the notes without recourse on him and I didn't even require any act to attach any responsibility whatever to the man that was selling the notes but took them as they were."

We approve the rule as laid down in Ewan v. Brooks-Waterfield Co., 55 Ohio St. 596, 45 N. E. 1094, 35 L. R. A. 787, 60 Am. St. Rep. 719, that the indorsement of the note was merely for the completing of the execution and delivery thereof, as required by the statute, and would be construed in no manner to be an indorsement in the sense of an indorsement when the note was transferred from one holder to another. When appellant accepted the note without an indorsement,

he was merely an assignee or a transferee by delivery and not an indorsee, and took the note subject to all defenses in the hands of Ben E. New.

The subject of good faith was an issue to be heard and decided by the trial court.

As there are sufficient facts to sustain the judgment of the trial court, which is binding upon us, we shall be bound thereby.

Finding no reversible errors committed by the court, the judgment is affirmed.

### On Motion for Rehearing

█ We have carefully gone over the record of this case again, and have concluded to reverse and remand the case for another trial.

See the testimony of appellee as copied in our original opinion, upon which we rely for a reversal.

We believe that the morals and good faith in this transaction are such as to warrant a reversal of this case for another trial.

The opinion is set aside, and the motion for new trial is granted, and the cause remanded for another trial.

### On Appellee's Motion for Rehearing.

#### PER CURIAM.

We deem it advisable and expedient to review and restate the facts in this case directly bearing on the only issue in the case, which is, Was appellant a purchaser for value in good faith, in due course, of the two notes executed by appellee on February 13, 1929, each in the sum of $4,525? It appears from the testimony of appellee, a well-to-do ranchman, living on his ranch in Val Verde county, about forty-two miles from Del Rio, that on February 13, 1929, a man named New, totally unknown to him, came to his ranch and offered for sale to him a number of German bonds. They were printed in the German language, and we presume from the fact that they weighed six pounds, and that each bond would not weigh more than an ounce, that there were from ninety to one hundred of them, of the face value of one hundred thousand marks each. If the mark had represented its value before 1914, the bonds would have represented a fortune, and, even with the value in 1929, the bonds represented "a good round sum."

New represented to Rosenow that the bonds were increasing in value at the rate of 25 per cent. every six months, or an annual increase of 50 per cent. This increase seemed to be very enticing to the ranchman, for, although he knew nothing of the value of the six pounds of bonds surmounted by a green eagle with flamboyant wings, the bond was quite attractive in appearance with its beautifully colored coupons, the whole being couched in the language of the "Vaterland," closing with the ponderous word "reichsschuldenverwaltung," which no doubt appealed to his trusting heart. He said he could not translate German into English, although born in Germany, but he evidently understood the words "Ein Hundert Tausend Mark," and knew that before the war, inaugurated by Germany in 1914, against Belgium and France and all other comers, that the mark was worth at least twenty-three cents in American money.

However, lured by the fact that the bonds purported to be issued in Germany, that they were in the language of his fathers, that they were enticing in appearance, and the fairy tale of an advance in value yearly of 50 per cent. he became reckless and at once executed his two notes for $4,525.00 each to the stranger and placed his approval on paper which was negotiable and calculated to lead friends or acquaintances to spend their money for such paper. He made no investigation for six months, but allowed his notes to go upon the market. He offers no defense to payment of the notes because guileless innocence, and childlike trust in the words of a perfect stranger constitutes no defense.

█ Appellee knew nothing of the worthlessness of the bonds and made no investigation, and yet he expected Campbell to investigate and inquire into the consideration of the notes. There was not a circumstance to put appellant upon notice of any fraud practiced upon appellee, and the law did not devolve on him the duty of an investigation into the value of the bonds.

█ Appellant was not guilty of any negligence in connection with the purchase of the notes. He had negotiations with New for the notes and offered $1,550 less than the face value of the notes, and the offer was accepted. The fact of the notes being discounted was not enough to arouse suspicion.

Appellant had bought notes of appellee before, at a discount, and knew his financial standing and relied upon it.

There is not even a circumstance to sustain the judgment of the trial court, and we adhere to our judgment reversing in favor of appellant, and the cause is remanded for another trial.

The motion for rehearing is overruled.